UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| ARACELI RICO, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | Case No. 08 C 2721 |
| v. | ) ) | Hon. Marvin E. Aspen |
| DAVIS BANCORP, Inc., | ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Araceli Rico filed a one-count complaint alleging pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. Defendant Davis Bancorp, Inc. ("DBI") answered and the parties completed discovery. Presently before us is DBI's motion for summary judgment. For the reasons discussed below, we grant the motion.

I.  FACTUAL BACKGROUND[1]

DBI is in the business of transporting bank checks. (Def. Facts ¶ 3.) Each day, DBI delivery drivers pick up, process, and deliver checks to and from various destination banks and processing centers. (*Id*. ¶ 8.) As part of its business, DBI tracks its delivery drivers, provides directions to them when they are lost, and maintains records regarding deliveries. (*See id.* ¶¶ 8, 25.) At all relevant times, J.R. Davis was the CEO of DBI. (*Id*. ¶ 7.)

---

[1] Unless otherwise noted, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 statements of fact and exhibits. While we have evaluated the objections raised by both parties, we will not issue a separate ruling on each statement of fact. Rather, we present the facts here as appropriate after carefully considering the evidence presented.

1

In 2004, DBI contracted with software consultant Metastorm to develop a customized software package to automate parts of DBI's business. (*Id.* ¶ 11.)[2] Before the Metastorm software became operational, DBI required its drivers to call the DBI office if they were fifteen minutes late on a delivery. (*Id.* ¶ 15.) The drivers also called in for directions when lost, (*see id.* ¶ 33), and kept handwritten receipts of each delivery, which were manually collected and logged at DBI's office, (*see id.* ¶ 29). At the end of each day, DBI compared the delivery logs to client orders to ensure that all checks had been accounted for. (*See id.* ¶ 25.) As a result of problems with these driver-tracking and manual record-keeping processes, DBI began losing customers. (*Id.* ¶¶ 9–10.) This business slowdown motivated DBI to approach Metastorm about creating a more automated system. (*See id.*)

From 2004 until around April 2006, Metastorm built and tested the new software package at a cost to DBI of over $500,000. (*Id.* ¶¶ 11, 13–14, 38.) Once the software was implemented, each driver received a customized, GPS-enabled phone to automatically track the driver's position, provide directions, and allow the driver to communicate bilingually with the DBI office. (*Id.* ¶¶ 12, 16, 31–33.) This automated tracking system eliminated the need for drivers to call the office when late or with questions. (*Id.* ¶¶ 31–33.) The software also automatically

---

[2] Rico claims that DBI did not hire Metastorm to develop the new software until 2005, not 2004 as DBI claims. (*See, e.g.*, Pl. Resp. to Def. Facts ¶ 11.) As support Rico cites only a non-disclosure agreement signed by DBI and Metastorm on April 8, 2005. (Pl. Ex. 2.) According to Rico, this non-disclosure agreement memorializes the date on which DBI's "management software consultants were retained per written agreement." (*See, e.g.*, Pl. Resp. to Def. Facts ¶ 11.) Rico mischaracterizes the document. The agreement is not a service contract, and it does not show when DBI entered into a service contract with Metastorm. The 2005 agreement does not contradict Davis's testimony that DBI initially contracted with Metastorm in 2004, (Davis Dep. at 25, 29), and therefore his testimony is undisputed.

collected and stored pickup and delivery information, replacing handwritten receipts and manual record-keeping. (*Id.* ¶¶ 27, 30.)

On November 17, 2004, Rico applied for a job at DBI and was hired the next day. (*Id.* ¶ 18.) Rico had no official job title. (*See* Gazda Dep. at 16.) Her job duties included:

- sorting, verifying, and filing paper courier receipts;

- answering and routing internal phone calls, primarily from drivers;

- comparing the daily totals of checks brought in by drivers and checks issued by the banks;

- observing drivers at the DBI office to ensure that they picked up the correct bags of checks and were dressed appropriately;

- notifying her supervisor if a driver received an incorrect bag or did not show up for work; and

- along with other employees, answering the secured office door and screening visitors with a handheld, wand-style metal detector.

(Def. Facts ¶¶ 25–26; Rico Dep. at 51–58.) Rico's immediate supervisor at DBI was Naybe Parra, who reported to DBI Vice President Christine Gazda. (Def. Facts ¶ 21.) During all relevant times, Rico satisfactorily performed all of her job duties. (Ans. ¶ 9.)

Around March 2006, Rico learned she was pregnant and so advised supervisor Parra. (*See* Rico Dep. at 62.) According to Rico, Parra told Rico that she should not tell anyone at DBI that she was pregnant because, if she did, DBI would fire her. (Pl. Facts ¶ 4; Rico Dep. at 62–63.) Around the beginning of May 2006, Rico told another DBI employee, Vice President of Security Gerry Lino, that she was pregnant, and Lino told Rico that she should inform Gazda. (Rico Dep. at 62, 69.) On or about May 15, 2006, Rico told Gazda that she was pregnant. (Ans. ¶ 7; Pl. Facts ¶ 5.) According to Rico, Gazda congratulated Rico and then the conversation ended. (Rico Dep. at 62.)

3

On May 19, 2006, DBI CEO J.R. Davis met alone with Rico and fired her. (Def. Facts ¶ 39.) According to Rico, during this meeting, Davis informed Rico that her position had been created for her when she was hired and was now being closed. (Rico Dep. at 60.) According to DBI, Rico was fired because her job duties had become redundant once the Metastorm software became fully operational. (Def. Facts ¶ 38.) No one was hired to replace Rico. (*Id.* ¶ 48.)[3] After her termination, Metastorm performed approximately 90% of Rico's duties; her remaining duties, including answering the office's secured door, were shared by all employees. (*Id.* ¶ 37.) Davis alone made the decision to fire Rico, (*id.* ¶ 38–39; Davis Dep. at 33),[4] and he did not learn that Rico was pregnant until after she had been fired, (Def. Facts ¶¶ 39–40; Davis Dep. at 31).[5]

---

[3] Rico claims that Melissa Jaramillo, who is discussed in more detail below, "was hired to replace" Rico. (Pl. Resp. to Def. Facts ¶ 44.) However, Jaramillo was hired more than two months before Rico told Gazda or Lino she was pregnant, (*see* Pl. Ex. 9), and therefore it is inconsistent for Rico to claim both that she was terminated because she told Gazda that she was pregnant *and* that Jaramillo was hired to replace her two months before she told Gazda of her pregnancy. There is no record support for the assertion that Jaramillo "was hired to replace" Rico.

[4] Rico claims to have raised an issue of material fact regarding who was the true decisionmaker: Davis, Gazda, or Parra. (Opp. at 5.) This claim is unsupported by the record. Her alleged support consists entirely of two statements made by Gazda in her deposition. (*See id.*) First, Gazda testified that Davis spoke to Gazda about Rico's termination *after* he had fired Rico. (Gazda Dep. at 22.) Second, Gazda testified that she was involved in the decision to terminate Parra, not Rico. (*Id.* at 35.) These statements are consistent with Davis's testimony that he alone made the decision to fire Rico, (Davis Dep. at 33), and it is not reasonable to infer from these statements that Gazda was involved in that decision. Further, it is unclear on what theory Rico believes she has raised an issue of fact as to whether Parra was involved in the decision to fire Rico, as there is no record support for this claim. Accordingly, it is uncontested that Davis was the sole decisionmaker.

[5] Rico claims to have raised an issue of material fact regarding whether Davis knew that Rico was pregnant prior to her termination. (Opp. at 5.) Rico attempts to support this assertion with formal logic: Davis testified that he thought at five months a pregnancy would be visible, (Davis Dep. at 33); Rico was five months pregnant at the time she was fired, (*see* Pl. Facts ¶ 23); therefore, according to Rico, Rico's pregnancy was visible to Davis at the time she was fired. (Opp. at 5.) From this conclusion she asks us to infer that Davis noticed and therefore knew of her pregnancy. (*Id.* at 5.) Rico's argument rests on a distortion of Davis's testimony. He testified as follows:

    Q:    Was [Rico] visibly pregnant [when you fired her]?

4

Davis fired Parra on the same day for performance reasons. (Def. Facts ¶ 42.)

On or around March 24, 2006, DBI hired Melissa Jaramillo. (*See id.* ¶ 44; Pl. Ex. 9). Jaramillo was hired to perform two functions: (1) special projects including taking inventory; and (2) writing job descriptions for DBI's employees. (Def. Facts ¶ 44.) Jaramillo was supervised by Gazda. (*Id.*) Jaramillo continued to perform these two primary job functions until she resigned on June 21, 2006. (*Id.* ¶ 46.) Jaramillo also cross-trained on Rico's job duties. (*Id.* ¶ 45.) After Rico's termination on May 19, 2006, and until Jaramillo's resignation one month later, Jaramillo, along with Gazda and other DBI employees, performed the approximately 10% of Rico's duties that were not automated by Metastorm. (*Id.* ¶ 37; Gazda Decl. ¶ 4.)[6]

---

    A:    No.

    Q:    Did you know that she was pregnant?

    A:    No.

    \*    \*    \*

    Q:    Would you be surprised to learn that she was five months pregnant at the time you fired her?

    A:    I would be surprised that she would be five months pregnant when I fired her?

    Q:    Why is that?

    A:    Because that to me would be visible.

(Davis Dep. at 31, 33.) It is not reasonable to infer from this testimony that Davis noticed Rico's pregnancy. Rico's only other argument that Davis knew of her pregnancy is the bald assertion that Gazda must have told Davis that Rico was pregnant. (Opp. at 6.) Davis explicitly denies this assertion in his deposition, (Davis Dep. at 32), and Rico raises no evidence to contradict his testimony. Accordingly, it is uncontested that Davis did not know that Rico was pregnant at the time he fired her.

[6] Rico claims that Jaramillo performed all of Rico's job duties after Rico was fired. (*See, e.g.*, Pl. Resp. to Def. Facts ¶ 46). She includes two citations as support. First, Rico cites to her own deposition testimony that at some time after she and Parra were fired, Parra told Rico that someone had told Parra that Jaramillo was doing Rico's job for some period of time—at least a few days. (Rico Dep. at 71–72, 76–77.) This testimony is clearly hearsay and cannot be used to defeat summary judgment. *See* Fed. R. Evid. 801©; *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) ("[H]earsay is inadmissible in summary judgment proceedings to the same

II.     STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c)(2). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (internal quotations omitted). Once the moving party meets this burden of production, the nonmoving party "may not rely merely on allegations or denials in its own pleading" but rather must "set out specific facts showing a genuine issue for trial." Fed R. Civ. P. 56(e)(2). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all reasonable inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

---

extent that it is inadmissible at trial . . . .").
    Second, Rico cites "Rico Exh. 14." Because Rico submitted only ten exhibits with her opposition brief, we assume she is referring to one of the deposition exhibits included in the record as part of Defendant's Exhibit B. (*See* Def. Ex. B at 5–7). This deposition exhibit is Rico's verified complaint filed with the Illinois Human Rights Commission in which Rico states: "I later found out that my position was never closed and that Melissa (unknown last name) that I trained kept my position." (*Id*. at 6.) In the verified complaint, Rico does not elaborate on how she "found out" that Jaramillo had replaced her, but based on the deposition testimony described above, she seemingly is referring to the same unusable hearsay statement, and in any case she has shown no actual evidence that Jaramillo replaced her. Therefore it is uncontested that Jaramillo did not perform all of Rico's duties after Rico's termination, but rather only performed a portion of the 10% of Rico's duties that were not automated by Metastorm.

III. ANALYSIS

Rico claims that DBI violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, by discriminating against her because she was pregnant. The Pregnancy Discrimination Act amended Title VII to clarify that Title VII's prohibition against discrimination on the basis of sex includes pregnancy discrimination. *See Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1154 (7th Cir. 1997). Thus, "[a]n unlawful employment practice is established whenever pregnancy is a motivating factor for an adverse employment decision." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 722 (7th Cir. 1998). A plaintiff may establish pregnancy discrimination through either the direct or indirect method. *See Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 844 (7th Cir. 2007).

A. Direct Method

Under the direct method, the plaintiff must offer direct or circumstantial evidence that supports an inference of intentional discrimination. *Paz v. Wauconda Healthcare and Rehab. Centre, LLC*, 464 F.3d 659, 665 (7th Cir. 2006). "The focus of the direct method of proof . . . is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008) (citing *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 n.3 (7th Cir. 2006)).

Under the direct method, direct evidence of discrimination is evidence that would show a clear acknowledgment of discriminatory intent by the employer. *See Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). "Direct evidence essentially requires an admission by the decisionmaker that his actions were based upon the prohibited animus." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000). Direct evidence is exceedingly rare.

7

*Id.*

More commonly, a plaintiff may succeed under the direct method by presenting circumstantial evidence which provides a "convincing mosaic of discrimination," *Troupe*, 20 F.3d at 737, from which a jury may reasonably infer intentional discrimination, *Volovsek v. Wisconsin Dep't of Agric., Trade & Cons. Prot.*, 344 F.3d 680, 689 (7th Cir. 2003). Relevant circumstantial evidence typically comes in three types:

> (1) suspicious timing, ambiguous statements, behavior towards other employees and so on; (2) evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently; or (3) evidence that the employee was qualified for the [job in question] and passed over and the employer's reason for the difference in treatment is a pretext for discrimination.

*Id.* at 689–90 (citing *Troupe*, 20 F.3d at 736). The third type of circumstantial evidence is substantially similar to one component of the indirect method, *see infra* Part III.B, and precedent governing the indirect method is useful in analyzing this type of evidence under the direct method. *See Venturelli v. ARC Cmty. Servs., Inc.* 350 F.3d 592, 601 (7th Cir. 2003) (citing *Huff v. UARCO, Inc.*, 122 F.3d 374, 380 (7th Cir. 1997)). A single type of circumstantial evidence by itself may be sufficient to establish an inference of discrimination, "depending of course on its strength in relation to whatever other evidence is in the case." *Troupe*, 20 F.3d at 736.

Rico alleges four pieces of evidence: (1) the suspicious timing of her termination three or four days after she informed Gazda that she was pregnant; (2) Parra's comment to Rico that Rico "shouldn't say that [she] was pregnant because . . . they would fire [her];" (3) DBI's more favorable treatment of Melissa Jaramillo, a nonpregnant and allegedly similarly situated employee; and (4) DBI's allegedly pretextual reason for terminating Rico. We address each in turn.

1. Suspicious Timing

The parties do not dispute that Rico was fired by Davis either three or four days after Rico told Gazda that she was pregnant. This timing is clearly suspicious. However, without some evidence connecting her pregnancy announcement to DBI's decision to terminate her, the timing alone does not create a sufficiently convincing mosaic of discrimination to permit a reasonable juror to infer that Davis acted with discriminatory intent when he fired Rico. *See Marshall v. Am. Hosp. Ass'n*, 157 F.3d 520, 526 (7th Cir. 1998) (citing *Hunt-Golliday v. Metro. Water Reclamation Dist. of Greater Chi.*, 104 F.3d 1004, 1010–11 (7th Cir. 1997)); *see also Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (noting that in Title VII retaliation cases "[o]n summary judgment, in particular, it is clear that mere temporal proximity is not enough to establish a genuine issue of material fact"). Therefore, Rico must present additional evidence before a reasonable jury could find that the decision to fire her was motivated by intentional discrimination.

2. Parra's Comment

Rico argues that Parra's comment—that Rico "shouldn't say that [she] was pregnant because . . . they would fire [her]," (Pl. Facts ¶ 4)—should be considered direct evidence of discrimination. (Opp. at 3–4.) DBI counters that this comment should be disregarded as a stray remark because Parra was not involved in the decision to fire Rico. (Mot. at 3–4.) We agree with DBI.

"[I]solated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (quoting *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006)). "A remark can raise an inference of

discrimination when it 'was (1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action.'" *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008) (quoting *Hemsworth*, 476 F.3d at 491 ); *see also Mlynczak v. Bodman*, 442 F.3d 1050, 1057–58 (7th Cir. 2006) (finding that comments by nondecisionmaker were irrelevant stray remarks); *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001) (same). As noted above, Davis alone made the decision to fire Rico. *Supra* note 3. Rico has presented no evidence linking Parra's comment to Davis's decisionmaking. Parra's comment to Rico, made by a nondecisionmaker two months before Rico was fired, was a stray remark and cannot be used to support an inference that Davis's decision to fire Rico was motivated by discriminatory intent.

        3.      Melissa Jaramillo

Rico argues that Jaramillo was a similarly situated, nonpregnant employee that DBI treated more favorably than Rico. The parties concede that Jaramillo was not pregnant and was not fired. Our inquiry therefore is focused on whether Jaramillo and Rico were similarly situated.

"A similarly situated employee is one who is 'directly comparable to [the plaintiff] in all material respects.'" *Bio v. Fed. Exp. Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (quoting *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002)). Possible factors for determining whether two employees are similarly situated "include whether the employees (I) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Ajayi v. Aramark Bus. Serv., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003). The first and

10

third factors are most relevant in this case.

To begin, it is undisputed that Rico and Jaramillo were not subordinate to the same supervisor—Rico reported to Parra; Jaramillo reported to Gazda—which weighs in favor of finding that Rico and Jaramillo were not similarly situated.

Rico argues, however, that Jaramillo replaced her after she was fired, and therefore that the two shared a job description and were similarly situated. (Opp. at 6–7.) While it is undisputed that Jaramillo, along with Gazda and other DBI employees, assumed some of Rico's duties after her termination, (*see* Gazda Decl. ¶ 4), it is also undisputed that the vast majority of Rico's duties were replaced by the Metastorm software, (*see* Def. Facts ¶ 37). Rico cites to no credible evidence showing that Jaramillo replaced her in any significant way. *See supra* note 6.

Instead, the record shows that Jaramillo and Rico had different job descriptions. Although neither had a formal job title, the tasks each was hired to perform were clearly defined and separate. As stated previously, Rico's primary job duties involved record-keeping and interacting with drivers. In contrast, Jaramillo was hired to write job descriptions and take inventory. Although Jaramillo was cross-trained on Rico's duties, Rico cannot show that, other than a portion of the 10% of Rico's duties not performed by Metastorm, Jaramillo ever performed Rico's duties.

Consequently, Rico has presented no evidence to support a finding that Jaramillo and Rico were similarly situated, and therefore cannot show that DBI treated a similarly situated, nonpregnant employee more favorably.

    4.  Metastorm as a Pretext for Discrimination

Finally, Rico argues that DBI's stated reason for terminating her—that Metastorm made her job duties redundant—is a pretext for intentional discrimination. (Opp. at 7–8.) "Pretext

exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). "A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000). "'[W]hat is at issue is not the wisdom of an employer's decision, but the genuineness of the employer's motives.'" *Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 575 (7th Cir. 2003) (quoting *Testerman v. EDS Tech. Prods. Corp.*, 98 F.3d 297, 304 (7th Cir. 1996)).

Rico's pretext argument is composed of four sub-arguments. First, Rico points to alleged inconsistencies in DBI's explanations for Rico's termination, which she claims show that Metastorm is a pretext for discrimination. In its Answer, DBI "affirmatively states that Rico was terminated due to the elimination of her position because of a business slowdown." (Ans. ¶ 10.) Rico claims that this statement is inconsistent with DBI's claim that Metastorm made Rico's job duties redundant. According to Rico, "[a] business slowdown is not an 'improved technology.'" (Opp. at 7.)

In response, DBI claims that lost business resulting from its formerly flawed record-keeping and driver-tracking processes—or a "business slowdown"—motivated DBI to seek out the Metastorm software. The Metastorm software, once operational, replaced Rico. According to DBI, therefore, the ultimate motivation behind Rico's termination was the business slowdown that motivated DBI to develop Metastorm. Contrary to Rico's first sub-argument, this explanation, although somewhat convoluted, is consistent with DBI's Answer and other statements regarding Rico's termination, and Rico has raised no evidence casting doubt on it.

Second, Rico argues that because Metastorm did not perform 100% of her duties, DBI's

reliance on Metastorm is a pretext for intentional discrimination. It is undisputed that Metastorm obviated about 90%, and not 100%, of Rico's duties. However, in the context of pretext, it is unclear what Rico believes this fact proves. It certainly does not prove that DBI is lying when it says that it fired Rico because Metastorm made her primary job functions redundant, which is what Rico must show in order to establish pretext. Therefore, her second sub-argument is irrelevant.

Third, Rico contrasts Davis's deposition testimony that Rico's position "wasn't closed" with DBI's Answer in which DBI states that her position was "eliminat[ed]." (Ans. ¶ 10; Davis Dep. at 82.) According to Rico, these statements are inconsistent and show that DBI is using Metastorm as a pretext for discrimination. This argument is also irrelevant. Davis testified:

> Q: Was Ms. Rico's position closed?
>
> A: It wasn't closed. It was redundant and no longer necessary. It served no purpose to the company once we automated those routines, and they were stable and worked.

(Davis Dep. at 82.) Whether we label Rico's position as "closed" or "eliminated" or "redundant" or "no longer necessary" does not matter. DBI has presented evidence that it fired Rico because the Metastorm software could perform her duties. The alleged contradiction in labeling raised by Rico does not rebut that evidence.

Fourth, Rico claims that the timing of Metastorm becoming fully operational just days after she informed Gazda that she was pregnant shows that Metastorm is a pretext. While this timing is perhaps suspicious, it does not prove that DBI is lying about its reason for firing Rico. Rico has shown no evidence of such a lie, as she is required to do to prove pretext. Consequently, no reasonable jury could find that DBI is using Metastorm as a pretext for intentional discrimination.

Other than the suspicious timing of her termination, Rico has presented no direct or circumstantial evidence of discrimination. As stated above, suspicious timing alone is not enough to create the convincing mosaic of discrimination required by the direct method of proof. Because Rico cannot make out a claim for pregnancy discrimination under the direct method, we now turn to the indirect method.

B. Indirect Method

The indirect method for proving pregnancy discrimination follows the burden-shifting approach of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). *See Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1005 (7th Cir. 2001). Under this method, the plaintiff initially has the burden of establishing the four elements of the prima facie case of pregnancy discrimination: (1) she was pregnant and her employer knew that she was pregnant; (2) she was preforming her duties satisfactorily; (3) she was fired; and (4) similarly situated, nonpregnant employees were treated more favorably. *Id.* If the elements are established, discrimination is inferred and the burden of production shifts to the defendant to raise a legitimate, nondiscriminatory reason for the firing. *Id.* Once a legitimate reason is offered, the inference of discrimination disappears, and the plaintiff must establish that the offered reason is a pretext for intentional discrimination. *Id.*

Rico fails under the indirect method for three independent reasons. First, as already discussed, she has raised no evidence from which a reasonable jury could find that Davis knew she was pregnant. *Supra* note 5. Second, she cannot establish that a similarly situated, nonpregnant employee was treated more favorably. *Supra* Part III.A.3. Third, DBI has raised a legitimate, nondiscriminatory reason for firing Rico: she was replaced by the Metastorm software. Rico cannot show from the record that this reason is a pretext for intentional

14

discrimination. *Supra* Part III.A.4. Thus, for each of these reasons, Rico cannot make out a claim for pregnancy discrimination under the indirect method of proof.

IV. CONCLUSION

For the reasons discussed above, Rico cannot prevail under either the direct or indirect method of proving pregnancy discrimination. We grant DBI's motion. It is so ordered.

_____
MARVIN E. ASPEN
United States District Judge

Dated: December 16, 2009